IN THE SUPREME COURT OF NORTH CAROLINA

No. 276A22

Filed 20 October 2023

STATE OF NORTH CAROLINA

v.

TROY LOGAN PICKENS


Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 284 N.C. App. 712 (2022), finding no error in part and vacating in part judgments entered on 1 November 2019 by Judge Carl R. Fox in Superior Court, Wake County, and remanding the case for resentencing. On 13 December 2022, the Supreme Court allowed the State's petition for discretionary review. Heard in the Supreme Court on 12 September 2023.

*Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Special Deputy Attorney General, for the State-appellee.*

*Michael E. Casterline for defendant-appellant.*


EARLS, Justice.

This case involves Troy Logan Pickens, a former chorus teacher at Durant Middle School, and his convictions for first-degree rape and first-degree statutory sexual offense with a child, Ellen,[1] a Durant Middle School student. While this trial involved defendant's assaults on Ellen, the first question before this Court is whether

---

[1] This is a pseudonym used to protect the identity of the minor victim in this case.

evidence of Pickens's alleged rape of another student, Kathleen,[2] was properly admitted at trial pursuant to Rule 404(b) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 404(b) (2021). The second issue this Court must address is whether the trial court improperly considered Pickens's decision to exercise his constitutional right to a jury trial when it imposed consecutive sentences. We find that the trial court properly admitted Kathleen's Rule 404(b) testimony and that the trial court did not improperly consider Pickens's choice not to plead guilty and exercise his right to a jury trial in sentencing Pickens.

## I.    Procedural History

Pickens was indicted for one count of first-degree statutory rape of a child by an adult offender and two counts of first-degree statutory sexual offense with a child by an adult offender. These cases were tried during the 21 October 2019 criminal session of Superior Court, Wake County. Before the trial began, Pickens filed a motion in limine to exclude evidence of the offense involving Kathleen pursuant to Rule 404(b) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 404(b). This motion was denied, and the jury found Pickens guilty of all charges. Pickens was sentenced to three consecutive active sentences of 300 to 420 months in prison. Pickens entered notice of appeal.

On appeal, the Court of Appeals determined Kathleen's Rule 404(b) testimony

---

[2] This is a pseudonym used to protect the identity of the minor Rule 404(b) witness in this case.

had been properly admitted. *State v. Pickens*, 284 N.C. App. 712, 719 (2022). Judge Murphy dissented on this issue, *see id*. at 722–35 (Murphy, J., dissenting), and Pickens filed a Notice of Appeal with our Court on 2 September 2022. On the sentencing issue, the Court of Appeals found the trial court improperly considered Pickens's exercise of his constitutional right to a jury trial during sentencing. *Id*. at 722 (majority opinion). The State filed a petition for discretionary review on this issue, which our Court allowed on 13 December 2022.

## II.    Background

Ellen was born in 2004 and lived with her parents and brother in Raleigh, North Carolina. She enjoyed playing soccer, riding bikes with her family and friends, participating in gymnastics, and singing in the church choir. In 2012, when Ellen was eight years old and in the third grade, her teachers began noticing she had difficulty focusing in class. This prompted her parents to consult a neuropsychiatrist, Dr. Jordana Werner, who ultimately diagnosed Ellen with attention-deficit/hyperactivity disorder (ADHD), inattentive type, with features of anxiety. Ellen was prescribed methylphenidate, a form of liquid Ritalin, as treatment.

In October 2014, after Dr. Werner moved out of state, Ellen began seeing Katherine Myers, a psychiatric physician assistant (PA), every three months. PA Myers testified that during that time, Ellen experienced anxiety about beginning middle school, which manifested as physical symptoms in the form of stomachaches and headaches. And while Ellen preferred eating some types of foods over others, she

"didn't have problems with the act of eating." To treat Ellen's anxiety, PA Myers prescribed an antidepressant, Lexapro, which is commonly used to treat anxiety and depression. According to PA Myers, Ellen appeared to be doing "very well" at her follow-up appointment in February 2015, as "[s]he was much less anxious[,] . . . was going to other people's houses[, and] . . . wasn't as scared." PA Myers's testimony regarding Ellen's subsequent follow-up appointment in June 2015 was similar, and PA Myers explained Ellen was adjusting to her medication well, without any reported side effects. Furthermore, while Ellen still had some anxiety about starting middle school, PA Myers did not consider this abnormal, and Ellen's anxiety subsided shortly after classes began.

In July 2015, at age eleven, Ellen began attending Durant Middle School. The school nurse administered Ellen's daily dose of Ritalin around 12:00 p.m. or 12:10 p.m., while other students were in class. This required Ellen to walk down the sixth-grade hallway alone. From 15 August 2015 to 14 September 2015, Pickens, a Durant Middle School chorus teacher, had a planning period from 12:15 p.m. to 1:00 p.m. This meant that Pickens was not teaching class around the time Ellen left her classroom and walked to the school nurse's office.

Soon after Ellen's anxiety about starting school subsided, her mother noticed a change in Ellen's behavior. Ellen began withdrawing from her neighborhood friends, her eating decreased, she stopped wanting to play outside, and she asked not to attend soccer practice. She began texting her mother around 11:30 a.m., just before

she was scheduled to leave her classroom to receive her daily dose of Ritalin, asking that her mother pick her up from school. In her texts, Ellen would provide different reasons for wanting her mother to pick her up. She would say her "tummy hurts" or that she was "really tired." In addition to asking to leave school frequently, Ellen also pleaded with her mother, "Please don't make me go to school. Please don't make me go to school. I don't want to go to school."

Ellen testified that she first met Pickens in the sixth-grade hallway, approximately one to two months after school began, while she was on her way to receive or on the way back from receiving her Ritalin from the school nurse. There was no one else in the hallway at the time. Ellen stated that Pickens motioned to her with his hand, gesturing for her to "come over" to him. When Ellen asked what Pickens needed, he responded, "I need you to be quiet." Pickens then grabbed the back of Ellen's shirt and took her into the largest stall in the sixth-grade bathroom, where he sexually assaulted her. This incident lasted approximately five minutes. Ellen did not report this incident because Pickens had threatened to hurt her or her family if she told anyone. Because Ellen was afraid Pickens would "do it again," she did not want to return to school.

Ellen's next encounter with Pickens was "worse than the first time." He grabbed the back of her shirt and her ponytail and took her back into the same bathroom stall where he had assaulted her previously. This time he raped her. While the encounter lasted only "[a] couple minutes," Ellen testified that "it felt . . . like[ ]

forever." She also testified that she cried during the assault. Ellen did not tell anyone what happened but asked her parents to keep her home from school.

Regarding Ellen's third encounter with Pickens, she reported that the "[s]ame first sequence" of events occurred and Pickens again raped her. However, this time Pickens also asked Ellen to defecate in the toilet and pick up the feces. Ellen testified that she "didn't want to touch [the feces]" but complied because Pickens had threatened her and her family. Pickens took the feces from Ellen and put it in her mouth, which caused Ellen to gag repeatedly. The feces was then smeared on the wall of the bathroom stall. According to Ellen's testimony, Pickens assaulted her in a similar manner almost every other day when she left class to take her medication. Some of Pickens's assaults also involved forcing Ellen to perform fellatio.

Glenn Moss, the former head custodian at Durant Middle School, testified that in August or September 2015, he noticed feces was being smeared on the wall of the largest bathroom stall in the sixth-grade girl's bathroom. This was the same bathroom stall where Ellen reported Pickens's assaults took place. Moss reported the smeared feces to the school administration, and in September 2015, Nancy Allen, the Durant Middle School principal, questioned Ellen about the smeared feces. Ellen denied smearing the feces on the bathroom wall and began to cry. Principal Allen spoke with Ellen's parents and explained that Ellen must receive a mental health evaluation before returning to school.

Around this time, Ellen exhibited even more troubled behavior. As mentioned

above, Ellen withdrew from her friends and refused to go to school. She also followed her mother everywhere, began sleeping with her mother each night, experienced flashbacks of her trauma, and began exhibiting disordered eating. As a result, Ellen experienced significant weight loss, so much so that her ribs and other bones were visible. Ellen was diagnosed with avoidant restrictive food intake disorder (ARFID), which involves a fear of eating, such as vomiting or choking, that is unrelated to weight gain. Ultimately, Ellen required inpatient psychiatric treatment, and due to her ARFID and resulting weight loss causing her to be below normal weight, it was necessary for her physicians to insert a feeding tube for proper nutrition.

In April 2017, Ellen disclosed to her mother that Pickens had hurt her. While she did not disclose the full extent of the sexual conduct Pickens forced her to engage in, she did disclose that Pickens had touched her inappropriately.

## III.    Standard of Review

This Court's review of whether Rule 404(b) evidence is properly admitted is a question of law and is reviewed de novo on appeal. *State v. Beckelheimer*, 366 N.C. 127, 130 (2012).

## IV.    Rule 404(b) of the North Carolina Rules of Evidence

Under Rule 404(b) of the North Carolina Rules of Evidence, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." N.C.G.S. § 8C-1, Rule 404(a) (2021). There is a good reason for this. Namely, if a jury chooses to

convict a defendant, then that conviction must be based on the evidence before the jury, not the jury's view of the defendant's character. In other words, a jury must convict a defendant because the State has met its burden to show that the defendant committed the alleged offense beyond a reasonable doubt, not because the jury believes the defendant may have committed similar crimes. *See* N.C.P.I.—Crim. 101.10 (Burden of Proof and Reasonable Doubt).

While evidence of a defendant's character is not admissible to prove he "acted in conformity therewith," N.C.G.S. § 8C-1, Rule 404(a), "[e]vidence of other crimes, wrongs, or acts . . . may, however, be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident," N.C.G.S. § 8C-1, Rule 404(b). Thus, Rule 404(b) has been characterized as a rule of inclusion, and evidence of prior bad acts is admissible unless the only reason that the evidence is introduced is to show the defendant's propensity for committing a crime like the act charged. *State v. Coffey*, 326 N.C. 268, 278–79 (1990). However, "Rule 404(b) is still constrained by the requirements of similarity and temporal proximity." *Beckelheimer*, 366 N.C. at 131 (cleaned up). To be admissible, prior bad acts do not need to "rise to the level of the unique and bizarre" and instead will be considered sufficiently similar and admissible "if there are some unusual facts present in both crimes that would indicate that the same person committed them." *Id.* (cleaned up).

## A. Kathleen's Rule 404(b) Testimony

At trial, Kathleen testified that she met Pickens when she was in seventh grade at Neal Middle School in Durham, North Carolina. Pickens was Kathleen's chorus teacher. One day, while Kathleen was leaving class Pickens put his hands on Kathleen's waist and touched her bottom. This occurred while other students were present, and it made Kathleen so uncomfortable that she ran out of the classroom.

When Kathleen was in eighth grade, Pickens asked Kathleen to participate in a singing and dancing performance called Evening of Entertainment, which was held at Riverside High School. When Kathleen declined to participate, Pickens called Kathleen's mother and received her consent. The practices for this event were held at Riverside High School, and Pickens drove Kathleen to each practice.

Kathleen turned fourteen on 1 February 2015. The following day, Pickens drove Kathleen to practice but stopped at his apartment to change his clothes. Kathleen initially stated she would wait for Pickens in the car, but Pickens said she "should come up" and Kathleen complied. When Kathleen arrived in Pickens's apartment, she sat on the couch and watched the cartoon "Teen Titans Go!" while Pickens made sandwiches for himself and Kathleen. After eating the sandwich and putting the dishes in the sink, Pickens returned to the couch, sat down next to Kathleen, and began to touch her left thigh. Kathleen moved Pickens's hand and "asked him not to do that." However, Pickens continued to touch Kathleen's leg, pulled her up by her arm, and took her into his bedroom. Kathleen testified that while

she tried to pull away from Pickens, she was 5′2″ and 100 pounds at the time and was unable to get away from him. Pickens threw Kathleen onto his bed and forced her pants and underwear off completely. Pickens pulled his pants halfway down and vaginally raped Kathleen. During the rape, Kathleen reported crying and asking Pickens to stop and to move away from her. But Pickens refused to stop. Afterwards, Pickens apologized to Kathleen and threatened her, stating that if she told anyone, he would rape her again.

In 2016, when Kathleen was in tenth grade, she was asked to write about an incident that changed her life. There, for the first time, she described what Pickens had done to her. After reading the paper, Kathleen's teacher reported the incident, and Kathleen spoke with law enforcement about what had occurred.

## B. Application of Rule 404(b) to Kathleen's Testimony

The State contends that Kathleen's Rule 404(b) testimony was offered for proper reasons: to prove Pickens's intent, motive, plan, and design to sexually assault middle school students from schools where he was a teacher. In support, the State shows that Pickens used his position as a teacher at Durant Middle School and Neal Middle School to gain access to both Ellen and Kathleen. Moreover, both of Pickens's victims were middle school students at a school where Pickens was employed. Ellen's and Kathleen's assaults also both happened during school-related activities or school hours. In Ellen's case, she was either on her way to receive medication from the school nurse or on her way back to class when the assaults occurred. For Kathleen, although

Pickens's alleged rape of her occurred off the school campus and in Pickens's apartment, the State contends that Pickens committed the assault while acting in his official capacity as a teacher as he was taking Kathleen to an after-school activity.

Furthermore, some of the assaults happened during school hours: namely, the sexual conduct Ellen described, which took place exclusively in the school bathroom, and Pickens's touching of Kathleen on her waist and bottom in the classroom. The State also notes that even though Pickens only engaged in vaginal intercourse with Kathleen, he attempted to do the same with Ellen but was unable to do so because of her small size. Only then did Pickens resort to anal intercourse and fellatio with Ellen.

According to the State, Pickens also asserted control over both Ellen and Kathleen through his position as a teacher. In Kathleen's case, (1) Pickens insisted she come up to his apartment despite Kathleen having stated she would wait in the car; (2) Pickens touched Kathleen's thigh even though she asked him to stop; (3) Pickens physically pulled Kathleen into his bedroom, threw her down on his bed, and raped her; (4) Pickens removed Kathleen's pants and underwear; and (5) Pickens continued to rape Kathleen despite her crying and asking him to stop. In Ellen's case, Pickens (1) physically pulled Ellen into the bathroom; (2) continued to sexually assault Ellen despite her tears; and (3) directed Ellen to remove her pants and underwear. Moreover, the State asserts that in both Ellen's and Kathleen's assaults, Pickens only removed his pants and underwear halfway down. Additionally, he

threatened both girls after the assaults occurred. Accordingly, the State contends that Kathleen's Rule 404(b) testimony meets the required standard and was properly admitted.

In response, Pickens argues that Kathleen's Rule 404(b) testimony was not sufficiently similar to be admissible. Namely, that there were "no unusual [distinguishing] similarities" between Ellen's and Kathleen's accounts. Pickens focuses on the differences between the victims and disparities in the incidents, noting that while Ellen was eleven years old, Kathleen was significantly older at fourteen years old. The girls had different physical builds in that Ellen was shorter than Kathleen by at least four inches, weighed thirty-five pounds less than Kathleen, and had not reached puberty at the time of the assault. Pickens also argues that his relationship with Kathleen was different from his relationship with Ellen, namely that Pickens knew Kathleen well because she had been in his class for two years, but the same was not true of Ellen who only attended the school where Pickens worked.

Furthermore, Pickens contends that the sex acts in Kathleen's case were substantially different from those Ellen described. This is because Kathleen's rape took place outside of school, in Pickens's apartment, and only involved vaginal intercourse. But Ellen's assault occurred on the school campus, in the girls' restroom, and included attempted vaginal intercourse, anal intercourse, and fellatio. Importantly, Pickens argues that there are no common facts between Ellen's and Kathleen's sexual assaults except for those common in any case involving a sex

offense by an adult against a child, and those facts cannot meet the admissibility standard required under Rule 404(b).

Our Rule 404(b) standard does not require identical or even near-identical circumstances between the charged offense and the prior bad act for evidence of the prior bad act to be admissible. *Beckelheimer*, 366 N.C. at 132. Instead, Rule 404(b) requires that the incidents share "some unusual facts that go to a purpose other than propensity for the evidence to be admissible." *Id.* (cleaned up). Here, as the State points out, the evidence was admitted to show an intent, motive, plan, and design to assault middle school students. The unique facts common to both victims include that: (1) the girls were middle-school-aged children attending schools where defendant taught; (2) defendant used his position as a middle school teacher to gain access to both victims; (3) defendant exerted control over both victims during the assaults despite their protests, tears and resistance; (4) defendant engaged in vaginal intercourse or tried to engage in vaginal intercourse with both victims; (5) defendant committed the offenses during school hours or during school-related activities; (6) defendant only removed his pants and underwear halfway during both assaults; and (7) defendant threatened the girls after the assaults were completed.

In *Beckelheimer*, this Court explained that the correct analysis for the admissibility of Rule 404(b) evidence involves focusing on the similarities and not the differences between the two incidents. *Id.* at 131–32. The same is true here. Because the similarities in this case are sufficient to show "some unusual facts present in both

crimes that would indicate that the same person committed them," *id.* at 131 (cleaned up), Kathleen's Rule 404(b) testimony was properly admitted. The trial court did not err in admitting this evidence and the Court of Appeals was correct in concluding the same. Accordingly, we affirm the Court of Appeals' decision regarding the admissibility of Kathleen's Rule 404(b) testimony.

## V.  Sentencing

### A. Standard of Review

"The general rule is that a judgment is presumed to be valid and will not be disturbed absent a showing that the trial judge abused his discretion." *State v. Bright*, 301 N.C. 243, 261 (1980). "A decision entrusted to a trial judge's discretion may be reversed only if it is manifestly unsupported by reason or so arbitrary that it could not have been a reasoned decision." *State v. Brown*, 314 N.C. 588, 595 (1985) (cleaned up).

### B. Consideration of Improper Factors During Sentencing

When a sentence imposed by the trial court is within statutory limits it is "presumed regular and valid." *State v. Boone*, 293 N.C. 702, 712 (1977). However, the presumption of regularity is overcome "[i]f the record discloses that the court considered [an] irrelevant and improper matter in determining the severity of the sentence." *Id.* (citing *State v. Swinney*, 271 N.C. 130 (1967)).

Under Article I, Section 24 of the North Carolina Constitution, "[n]o person

shall be convicted of any crime but by unanimous verdict of a jury in open court."[3]

N.C. Const. art. I, § 24. "No other right of the individual has been so zealously guarded

over the years and so deeply embedded in our system of jurisprudence as an accused's

right to a jury trial." *Boone*, 293 N.C. at 712. Accordingly, "[t]his right ought not to be

denied or abridged nor should the attempt to exercise this right impose upon the

defendant an additional penalty or enlargement of his sentence." *Id.*; *see also State v.*

*Cannon*, 326 N.C. 37, 39 (1990) ("A criminal defendant may not be punished at

sentencing for exercising this constitutional right to trial by jury."). Thus, "[w]here it

can reasonably be inferred from the language of the trial judge that the sentence was

imposed at least in part because defendant . . . insisted on a trial by jury, defendant's

constitutional right to trial by jury has been abridged, and a new sentencing hearing

must result." *Id.*

## C. Background

The trial court made the following statement before sentencing Pickens:

> To say the facts of this case are egregious is putting it
> mildly. The facts of this case are among the worst I've ever
> seen, and I've seen a lot of cases, thousands as a prosecutor,
> thousands as a judge. One of the things that one has to
> understand — I was thinking about this earlier — is that
> children the age of 11, unless they are really in an
> [un]usual environment, have no idea about sex acts. They
> just don't. I mean, I'm sure — I've seen girls who were

---

[3] This right may be waived through procedures prescribed by the General Assembly and with the consent of a trial judge in cases where the State is not seeking a death sentence in superior court. N.C. Const. art. I, § 24. Additionally, "[t]he General Assembly may . . . provide for other means of trial for misdemeanors, with the right of appeal for trial de novo." *Id.*

pregnant at that age, but they shouldn't have been, but were raped. They weren't consensual acts.

The Legislature did something several years ago when they enacted this structured sentencing that I totally agreed with and I advocated for for ten years before they did it, and that was to make — send a clear message that there was a difference between a violent crime and crimes against — and nonviolent crimes, crimes against property, because the effect is totally different. I mean, just seeing these children testify in this case was just evidence to anyone who opened their eyes who had listened to it as to how damaged these children were by their experience. I don't — given the number of women out here in the world, I don't understand why some people choose underage girls, but it's wrong. It's morally wrong. It's legally wrong, and there's no justification for it.

It would be difficult for an adult to come in here and testify in front of God and the country about what those two girls came in here and testified about. It would be embarrassing. It would be embarrassing to testify about consensual sex in front of a jury or a bunch of strangers. And in truth, they get traumatized again by being here, but it's absolutely necessary when a defendant pleads not guilty. They didn't have a choice and you, Mr. Pickens, had a choice.

Following these remarks, the trial court sentenced Pickens to a minimum of 300 months and a maximum of 420 months for each of the three charges the jury found him guilty of. Each sentence was ordered to run consecutively.

On appeal, the Court of Appeals determined that the trial court's statements to Pickens revealed that it had improperly considered Pickens's exercise of his constitutional right to a jury trial when imposing Pickens's sentence. Namely, the Court of Appeals explained that while a trial court may use its discretion to impose

consecutive sentences, in this case, there was a "clear inference that a greater sentence was imposed because Defendant did not plead guilty." *Pickens*, 284 N.C. App. at 722.

## D. Mr. Pickens's Sentencing

The language at issue is the trial court's statement during sentencing that: "They didn't have a choice and you, Mr. Pickens, had a choice." Mr. Pickens argues that it can be reasonably inferred that these words referred to his decision to plead not guilty and to exercise his right to a jury trial. However, the State argues that the trial court's statement was not related to Pickens's choice to proceed with a jury trial but instead referred to his choice to commit egregious sexual assaults on Ellen and Kathleen against their will. The State supports its argument by highlighting the context in which the court's statement was made. Namely, that before using these particular words, the trial court was discussing Pickens's choice to sexually assault Ellen and Kathleen. Thus, according to the State, it can be reasonably inferred that in making the statement at issue, the trial court was referring to Pickens's decision to assault Ellen and Kathleen and not Pickens's decision to exercise his right to a jury trial. It is frequently difficult to prove intent in this context. We must be vigilant to protect the right to a jury trial and ensure that individuals who choose to assert that right are not punished for doing so. *See Boone*, 293 N.C. at 712 (providing that the right to a jury trial "ought not to be denied or abridged nor should the attempt to exercise this right impose upon the defendant an additional penalty or enlargement

of his sentence").

Nevertheless, our precedents in *Boone*, 293 N.C. 702; *State v. Langford*, 319 N.C. 340 (1987); and *Cannon*, 326 N.C. 37, provide some guidance. In *Boone*, we determined that the trial court had improperly used the defendant's choice not to plead guilty against the defendant during sentencing. 293 N.C. at 712. There, in open court, the trial court "indicated that [it] would be compelled to give the defendant an active sentence due to the fact that the defendant had pleaded not guilty." *Id*. Similarly, in *Cannon*, this Court found that the trial court had violated each defendant's right to a jury trial. 326 N.C. at 40. There, after being "advised that defendants demanded a jury trial, the trial judge told counsel in no uncertain terms that if defendants were convicted he would give them the maximum sentence." *Id*. at 38. However, this case is not like *Boone* or *Cannon*. The trial court in Pickens's case did not explicitly state that it was giving Pickens a harsher sentence because he chose to exercise his right to a jury trial. *See Boone*, 293 N.C. at 712; *Cannon,* 326 N.C. at 38.

The Court of Appeals has also addressed this issue more recently in *State v. Hueto,* 195 N.C. App. 67 (2009), and *State v. Haymond*, 203 N.C. App. 151 (2010). The facts in both cases illustrate that the entire context of a trial judge's statements must be examined when determining whether a reasonable inference can be made that the court had improperly considered the defendant's decision not to plead guilty when sentencing him. *See Hueto,* 195 N.C. App. at 74–78 (examining pre-trial and post-

verdict statements by the trial court); *Haymond,* 203 N.C. App. at 169–71 (considering statements relating to sentencing made at several hearings in the case).

Pickens's case is also not analogous to *Hueto* or *Haymond* because those cases involved pretrial and posttrial statements that referenced the defendant's sentencing, which when taken together and in conjunction with the sentence the trial court imposed, created an inference that the defendant's choice to go to trial was considered during sentencing. *See Hueto*, 195 N.C. App. at 78; *Haymond*, 203 N.C. App. at 171. In this case, the only statement at issue occurred during sentencing, and the parties have not asked this Court to consider any other statements made by the trial court.

In *Langford*, this Court determined that the trial court's statements did not show an intent to penalize the defendant for exercising his right to a jury trial. 319 N.C. at 346. The defendant argued that the following statement by the trial court showed the court sentenced him to a consecutive sentence because he chose not to plead guilty: "I'm aware that I could have avoided this trial had I been willing at the outset of the trial to commit myself to concurrent sentences." *Id*. This Court noted that while the defendant pointed to this statement "in isolation," the whole record did not evidence that a harsher penalty was imposed based on the defendant's choice to exercise his right to a jury trial. *Id*. Moreover, while the trial court's statement may have been "an unnecessary statement," it referenced nothing more than a "historical fact." *Id*. This was because the record showed that the "defendant was forced to plead

not guilty and to proceed to trial [because] . . . the prosecutor and trial court refused to agree in advance to a concurrent sentence." *Id.* Accordingly, there was no indication that the trial court would have made the sentence concurrent had the defendant pleaded guilty. *Id.* In essence, all the record showed was that the trial court's statements reflected its refusal to decide whether the defendant's sentence would be concurrent or consecutive until it heard the evidence presented at trial. *Id.*

*Langford* is particularly instructive and stands for the proposition that the statement at issue cannot be reviewed in isolation but instead must be considered with the remainder of the record. 319 N.C. at 346. Pickens points out that the trial court discussed "the act of the trial itself" and the victims' need to testify at trial immediately before stating, "They didn't have a choice and you, Mr. Pickens, had a choice." He contends this context means it can be inferred that during sentencing the trial court improperly considered his choice to plead not guilty. However, when the trial court's statement is reviewed alongside other portions of that same discussion, an equally reasonable inference could be drawn that the court was not referring to Pickens's exercise of his right to a jury trial and instead was referring to the egregious nature of Pickens's crimes and his decision to commit those crimes.

With the ambiguous statement capable of multiple interpretations, the "presumption of regularity" is not overcome, *Boone*, 293 N.C. at 712, and we conclude the trial court did not violate Pickens's constitutional right to a jury trial when it imposed Pickens's sentence or when it imposed consecutive sentences on Pickens. *See*

*Cannon*, 326 N.C. at 39. Thus, we affirm the Court of Appeals' holding that the Rule 404(b) evidence of Pickens's assault on Kathleen was properly admitted and reverse the Court of Appeals' decision to vacate Pickens's sentence, resulting in a reinstatement of the original sentence imposed by the trial court.

AFFIRMED IN PART AND REVERSED IN PART.